UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UCHENNA OBINABO, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :  No. 3:09cv1772 (MRK) |
| | : |
| RADIOSHACK CORP., | : |
| | : |
| Defendant. | : |

## MEMORANDUM OF DECISION

Plaintiff Uchenna Obinabo alleges that his former employer, Defendant RadioShack Corp., discriminated against him on the basis of his sexual orientation and retaliated against him when he raised a protest against that discrimination. After this case was removed from Connecticut state court, this Court denied summary judgment to RadioShack and held a three-day bench trial in October 2011. Having considering the evidence presented at trial and the briefing submitted since, the Court finds that Mr. Obinabo has failed to show by a preponderance of the evidence that he experienced either discrimination or retaliation. Given Mr. Obinabo's lackluster performance as Store Manager, the Court is convinced that RadioShack had legitimate, nondiscriminatory, and nonretaliatory reasons for choosing to terminate him.

**I.**

The Court begins by stating its findings of fact, in accordance with Rule 52 of the *Federal Rules of Civil Procedure*.

1

Mr. Obinabo, who identifies as gay, began working for RadioShack in 1997, first as a Sales Associate and then, in 1999, as a Store Manager. Mr. Obinabo continued in that position, managing a number of different RadioShack stores until his termination on September 26, 2008. As Store Manager, Mr. Obinabo was responsible for managing the store's employees, keeping the store and back room clean and organized, ensuring that merchandise bore price tags, and setting up store displays.

In July 2008, at which time Mr. Obinabo was the Store Manager of RadioShack's Bloomfield, Connecticut location, RadioShack hired Chuck Harris as its New England Regional Sales Manager. Mr. Harris oversaw several District Managers, who in turn oversaw Store Manages such as Mr. Obinabo. Soon after Mr. Harris began working at RadioShack, he interviewed Mr. Obinabo, who had twice taken RadioShack's District Manager course, for a promotion to District Manager. After interviewing three other candidates—two internal and one external to the company—Mr. Harris hired the external applicant: Linn Baranowitz, who began managing Mr. Obinabo's district in August 2008. While RadioShack was in the process of filling the District Manager position, a former manager—Paul Pikulski—had informally overseen the district. Messrs. Obinabo, Harris, Pikulski, and Baranowitz all testified at trial, although only Mr. Pikulski still works for RadioShack.

Mr. Harris and Mr. Baranowitz were hired in part because of their familiarity with "Non-Negotiable Standards," a concept which RadioShack adopted in 2008. These included explicit standards on "people," "property," and "performance" which, as Mr. Obinabo acknowledged at trial, all stores were expected meet.

In July 2008, Mr. Harris and Mr. Pikulski visited Mr. Obinabo's store as part of a "bottom three, top one" visit, wherein managers would visit a district's best and worst

performing stores. Mr. Obinabo's store was one of the "bottom three." Mr. Harris and Mr. Pikulski both testified that Mr. Obinabo's store was in disarray, with the highly valued fifteen to eighteen feet at the front of the store completely empty. Mr. Harris testified that not only was Mr. Obinabo's store not in compliance with the company's non-negotiable standards, but it was so thoroughly incompliant that Mr. Harris himself would have been fired had his superiors seen the condition of the store. It was, he testified, among the bottom three stores he ever visited during his career at RadioShack. Mr. Obinabo confirmed at trial that eighteen feet of space at the front of his store were empty at the time of this visit.

On August 13, 2008, Mr. Pikulski returned to Mr. Obinabo's store with Mr. Baranowitz and found it to be in largely the same condition; in particular, the front area of the store was still empty. Mr. Pikulski's recollection was confirmed by Mr. Baranowitz, who testified that Mr. Obinabo's store was in such poor condition that a customer would not want to stay in it to buy anything.

(The Court pauses to note that in this, as in the rest of his testimony, it found Mr. Baranowitz entirely credible, not only in his demeanor on the stand, but also because he was testifying after having been fired by RadioShack in 2010 and because Mr. Obinabo himself testified that he and Mr. Baranowitz had a "great" relationship and that he did not believe that Mr. Baranowitz discriminated against him on the basis of his sexual orientation, *see* Trial Tr. [doc. # 88] at 129. Thus, Mr. Baranowitz seems to have had no motivation to be anything other than completely candid in the testimony he offered.)

The following day, Mr. Obinabo joined a conference call in which Mr. Pikulski introduced Mr. Baranowitz to other store managers in the district. Mr. Obinabo did not identify himself at any point during the conference call, which he joined by cell phone from

his car. At the end of the call, Mr. Obinabo heard Mr. Pikulski say, "See you fags later." Oraine Howell, Mr. Obinabo's Assistant Manager at the time, also testified at trial that he had heard Mr. Pikulski say this. Mr. Pikulski denies having said it. Mr. Baranowitz testified that he did not hear the comment, and an internal investigation—prompted by an anonymous complaint Mr. Obinabo made to the RadioShack employee telephone hotline—did not turn up any other managers who had heard Mr. Pikulski utter the slur.

On September 4, 2008, Mr. Baranowitz visited Mr. Obinabo's store with a group of RadioShack executives, some from corporate headquarters, who were referred to as the "Area Cabinet." Mr. Baranowitz had advised Mr. Obinabo by email that it would be in his interest to be there for the visit, but Mr. Obinabo was not present. During the visit, one member of the Area Cabinet refused to use the restroom in the store because of its condition; another counted missing price tags and reported that he stopped counting at 450. Mr. Baranowitz testified that he never saw another store with more than 200 price tags missing. Mr. Baranowitz was told that, rather than firing Mr. Obinabo, he was to put Mr. Obinabo on a fourteen day "action plan." Mr. Baranowitz discussed this with Mr. Obinabo by phone on September 5 and he personally delivered a "Counseling" and a "Defined Action Plan" to Mr. Obinabo on September 11. The Plan stated: "Sustained improvement is required, and further discipline up to and including termination will result" if the required action was not taken within fourteen days. Ex. 6.

Mr. Harris accompanied Mr. Baranowitz to the meeting with Mr. Obinabo on September 11. During the course of their visit, Mr. Obinabo claims that Mr. Harris used a football metaphor, which Mr. Obinabo did not understand. When Mr. Obinabo asked Mr. Harris not to use sports analogies, he claims that Mr. Harris responded: "Here we go with that

gay shit again." However, in an email Mr. Obinabo sent to Mr. Baranowitz that afternoon, Mr. Obinabo complained instead that Mr. Harris had rolled his eyes and said "'here we go with that again'. . . ". Ex. 549 (ellipsis in original).

After signing the Defined Action Plan on September 12, Mr. Obinabo left for a previously scheduled vacation. He returned on September 19 and received a visit from Mr. Baranowitz on September 22. Finding the improvement at the store unsatisfactory, Mr. Baranowitz, on September 23, filled out a personnel form that would be necessary in the event that he decided to terminate Mr. Obinabo. He noted on the form that "12 days in[to the 14 day action plan] store appearance was worse than when plan was issued". *See* Ex. 12. Mr. Baranowitz testified that he asked his district administrator not to process the paperwork until or unless Mr. Obinabo failed to complete his action plan.

Mr. Baranowitz returned to Mr. Obinabo's store on the morning of September 25. On that visit, he found several hundred missing price points, but also noted improvements over his previous visit. Because of those improvements, Mr. Baranowitz gave Mr. Obinabo twenty-four more hours to complete the action plan in its entirety. In an email that morning, Mr. Baranowitz notified two of his superiors, including Mr. Harris, that he had given Mr. Obinabo another day in which to fix the missing price points and to prepare a "business case" in which Mr. Obinabo would identify "specific action steps" for improving the store over the following thirty days. Ex. 552. Mr. Baranowitz formalized these two requirements in a "Corrective Action Record" which he and Mr. Obinabo both signed on the morning of September 25. *See* Ex. 7.

At their meeting on the morning of September 26, Mr. Obinabo gave Mr. Baranowitz what the latter testified was a handwritten plan; Mr. Obinabo testified instead that he brought

5

a typed plan and was then asked to fill the information out by hand on a form Mr. Baranowitz provided him. RadioShack submitted the handwritten form as an exhibit at trial, *see* Ex. 556; Mr. Obinabo claims not to have saved a copy of his typed version. Regardless, Mr. Baranowitz was not satisfied with the plan Mr. Obinabo produced at their meeting on the 26th, and he claims to have terminated Mr. Obinabo on that basis. Mr. Baranowitz testified that it was his decision to fire Mr. Obinabo and that no one at RadioShack told him to find a reason to do so. Mr. Obinabo was eventually replaced as store manager by a man who was said to have been previously been married to a woman.

## II.

Unlike federal employment antidiscrimination law, Connecticut state law prohibits employers from discharging an employee or discriminating against an employee in the "terms, conditions or privileges of employment" because of that employee's sexual orientation. Conn. Gen. Stat. § 46a-81c. Connecticut also prohibits employers from discharging "any person because such person has opposed any discriminatory employment practice." Conn. Gen. Stat. § 46a-60(a)(4). Mr. Obinabo claims that RadioShack violated both of these prohibitions.

Although this case is based solely on Connecticut law," Connecticut's courts "review federal precedent concerning employment discrimination for guidance in enforcing [Connecticut's] own anti-discrimination statutes." *Levy v. Comm'n on Human Rights and Opportunities*, 236 Conn. 96, 103 (1996). The Court will thus review and apply the applicable state and federal precedent regarding, first, disparate treatment claims and, second, retaliation claims in the two Sections that follow.

A.

"The principal inquiry of a disparate treatment case is whether the plaintiff was subjected to different treatment because of his or her protected status." *Id.* at 104. To determine whether a plaintiff was treated in this way, courts often employ the burden-shifting framework familiar from the Supreme Court's *McDonnell Douglas* and *Burdine* decisions. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under these cases, the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). "A plaintiff satisfies this burden if he or she introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." *Id*. The defendant must then articulate "a legitimate, nondiscriminatory reason" for terminating the plaintiff. *Burdine*, 450 U.S. at 253. If it does so, "the presumption of discrimination raised by the prima facie case is rebutted" and "drops from the case." *Id.* at 255; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). "The defendant's 'production' (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against him." *Id.* at 511 (quotation marks and alteration omitted); *see also Craine v. Trinity Coll.*, 259 Conn. 625, 637 (2002) ("The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias.").

Here, because RadioShack has offered legitimate, nondiscriminatory reasons for firing Mr. Obinabo, the Court can turn directly to the ultimate question of whether Mr. Obinabo has,

7

by a preponderance of the evidence, established that his termination was based on his sexual orientation. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16 (1983).

1.

Mr. Obinabo points to two instances in which he says superiors at RadioShack expressed anti-gay animus: the alleged "see you later fags" slur during Mr. Pikulski's conference call and the "gay shit" comment said to have been made by Mr. Harris during his last visit to Mr. Obinabo's store.

The second of these allegations is called sharply into question by the email that Mr. Obinabo wrote to Mr. Baranowitz almost immediately after the incident. There he described Mr. Harris rolling his eyes and saying "'here we go with that again'. . . ". Ex. 549 (ellipsis in original). Given that Mr. Obinabo's email was meant as a complaint against Mr. Harris—and that Mr. Obinabo had proven willing to report other perceived gay slurs—the Court finds it hard to believe that Mr. Obinabo would have left out the most offensive element of his exchange with Mr. Harris. For these reasons, it is difficult to credit Mr. Obinabo's current claim that Mr. Harris used the words he said he did.

The slur allegedly uttered by Mr. Pikulski also found shaky support in the evidence presented at trial. Witnesses were evenly split as to what was said. In the end, however, the Court does not really need to decide what words Mr. Pikulski might have used, for Mr. Obinabo presented no evidence at trial that Mr. Pikulski played any role whatsoever in the decision to terminate him. Courts in this Circuit consider four factors when weighing the relevance of a stray remarks in discrimination cases: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . . ; and (4) the

context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Here, the slur in question was allegedly uttered some six weeks before Mr. Obinabo's termination; even more importantly, it was uttered by a person who was ceding his authority over Mr. Obinabo and in a context far removed from the decision-making process that led to Mr. Obinabo's termination. Thus, even aside from the parties' dispute over whether the offensive statement was made—or whether Mr. Obinabo, who was on his car phone at the time, may have misheard a more innocuous remark—the context of the utterance was too far removed from Mr. Obinabo's termination to show that the termination had anything to do with Mr. Obinabo's sexual orientation.

The relevance of Mr. Harris's and Mr. Pikulski's alleged statements is lessened by Mr. Baranowitz's credible testimony that the decision to fire Mr. Obinabo was his to make. Mr. Harris similarly testified that the termination decision was Mr. Baranowitz's; Mr. Harris said that he never recommended to Mr. Baranowitz that he fire Mr. Obinabo, although he saw the problems at Mr. Obinabo's store and was kept informed about Mr. Baranowitz's decision. Mr. Obinabo candidly admitted at trial that he does not believe that Mr. Baranowitz personally discriminated against him on the basis of his sexual orientation. If the termination decision was Mr. Baranowitz's and Mr. Baranowitz did not discriminate, Mr. Obinabo claim of discriminatory termination loses its force.

In sum, Mr. Obinabo has provided little reason to believe that sexual orientation discrimination motivated the decision of RadioShack in general, and of Mr. Baranowitz in particular, to terminate his employment.

2.

More decisively still, RadioShack provided overwhelming evidence that it had a legitimate, non-discriminatory reasons for firing Mr. Obinabo. Trial testimony included descriptions of empty space in the front of the store; hundreds of merchandise items that were missing price tags (in violation of Connecticut law); a bathroom so poorly maintained that a RadioShack executive left to use another store's bathroom; a storeroom with moldy pizza left on the floor; and repeated visits to the store because it was one of the three worst in the district. All of these descriptions point to legitimate reasons for wanting to remove Mr. Obinabo as store manager. Further, Mr. Obinabo admitted at trial that going on vacation after receiving an action plan with a fixed deadline was ill advised. *See* Trial Tr. [doc. # 88] at 165-66. Mr. Obinabo's failure to respond adequately to the opportunities Mr. Baranowitz gave him to improve provided an entirely legitimate ground for firing him.

The Court finds that Mr. Obinabo's failure to meet RadioShack's "Non-Negotiable Standards"—or to satisfy Mr. Baranowitz that he would be able to meet those standards in the future—is what led to his termination. Mr. Obinabo has not persuaded the Court that sexual orientation discrimination was the cause.

B.

Retaliation claims are evaluated under a burden-shifting analysis similar to the one just discussed. The difference arises in the elements that constitute a plaintiff's *prima facie* case: the employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Under Connecticut law, a person who

has "opposed any discriminatory employment practice," Conn. Gen. Stat. § 46a-60(a)(4), has participated in a protected activity.

The Court assumes that Mr. Obinabo participated in a protected activity when he complained about the slur that he heard, or thought he heard, during the conference call with Mr. Pikulski. RadioShack obviously knew about his complaint, given the fact that it carried out an investigation. The question for the Court to decide is whether Mr. Obinabo has shown by a preponderance of the evidence that his termination stemmed from his protected activity—as opposed to the legitimate, nonretaliatory reasons which RadioShack has proffered.

The Court's analysis here does not differ much from that already given. Mr. Obinabo has provided little evidence that there was a causal connection between his protected activity—the call to the employee hotline—and his termination. Mr. Harris and Mr. Baranowitz both knew about Mr. Obinabo's complaint, but the only evidence that either of them might have been influenced by that knowledge is Mr. Obinabo's testimony that Mr. Baranowitz said he was being pressured to fire Mr. Obinabo because of the complaint. This testimony, in addition to being self-serving, is both uncorroborated and implausible. If Mr. Baranowitz or others were looking for an excuse to fire Mr. Obinabo, the condition of his store during the Area Cabinet visit would have provided one. Rather than firing Mr. Obinabo on the spot, RadioShack gave him a fourteen-day action plan. Even once that expired, Mr. Baranowitz gave Mr. Obinabo a twenty-four hour extension—a decision which makes no sense if his goal was to get rid of Mr. Obinabo for his own or his superiors' retaliatory reasons.

As above, the evidence of RadioShack's legitimate, nonretaliatory reasons for firing Mr. Obinabo far outweigh the meager evidence supporting his retaliation claim. Mr. Obinabo has again failed to persuade the Court that he was terminated for any reason other than his poor performance.

## III.

From the evidence presented at trial, the Court finds that RadioShack fired Mr. Obinabo not because he is gay or because he complained about a gay slur, but because he failed to meet RadioShack's management standards and failed to respond adequately to repeated demands for improvement. The Court thus finds for the Defendant.

**The clerk is instructed to enter judgment for RadioShack Corp. and to close this case.**

                                            **IT IS SO ORDERED.**

                                          /s/  Mark R. Kravitz
                                          United States District Judge

**Dated at New Haven, Connecticut: April 30, 2012.**